1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Tommy Rice,
Plaintiff,

v.

SUPER EGO HOLDING, LLC;
SUPER EGO LOGISTICS, INC.;
SUPER EGO DISPATCH, INC.;
ROCKET EXPEDITING, LLC;
FLOYD, INC.;
KORDUN EXPRESS, INC.;
JORDAN HOLDINGS, INC.;
REX TRUCKING, INC.;
MN89, LLC;
ALEKSANDAR MIMIC, individually;
MARKO NEGIC, individually;
JOHN DOES 1–50,
Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**JUDGE BARKER**

Judge_____

Case No. 5:26 CV 186

**FILED**

JAN 23 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

## COMPLAINT FOR DAMAGES
## JURY TRIAL DEMANDED

---

## INTRODUCTION

1. This action arises out of Defendants' fraudulent, abusive, unsafe, deceptive, and unlawful trucking practices inflicted on Plaintiff between April 29, 2025 and August 16, 2025.

2. Defendants did not passively accept Plaintiff as a driver. Instead, during March and April 2025, Defendants aggressively pursued Plaintiff through repeated recruiting efforts, portraying themselves as a reliable carrier offering safe equipment, steady freight, and fair treatment, in order to induce Plaintiff to enter a trucking relationship under materially false and misleading pretenses.

2

3. Defendants emphasized promises of dependable equipment, professional dispatch support, and financial stability, while concealing systemic maintenance failures, unsafe equipment practices, predatory compensation structures, and enterprise-wide misconduct that Plaintiff would later experience firsthand.

4. Plaintiff reasonably relied on Defendants' representations in agreeing to work with Defendants. Defendants' recruitment and inducement were not isolated or accidental, but rather part of a broader pattern of enterprise conduct designed to draw drivers into relationships in which Defendants retained unilateral control, shifted financial and safety risks onto drivers, and avoided accountability.

5. Upon information and belief, Defendants collectively operate as a single integrated trucking enterprise, utilizing numerous affiliated corporate entities—including Super Ego Holding, LLC; Super Ego Logistics, Inc.; Super Ego Dispatch, Inc.; Rocket Expediting, LLC; Floyd, Inc.; Kordun Express, Inc.; Jordan Holdings, Inc.; Rex Trucking, Inc.; and MN89, LLC—to obscure responsibility, evade liability, shift assets, manufacture debt, and continue operations under new names.

6. Throughout Plaintiff's engagement, Defendants subjected Plaintiff to repeated denial of critical safety repairs, forced operation of defective commercial motor vehicles, extreme heat exposure without functioning air conditioning, coercive dispatch practices, false promises of continued work, and unsafe operating conditions.

7. Defendants' conduct culminated in a preventable bridge collision, abandonment of Plaintiff out of state, fuel card shut-offs, fabricated safety violations, termination based on false information, repossession of equipment containing Plaintiff's personal property, obstruction of insurance and property claims, and severe emotional and financial harm.

8. Defendants' actions violated federal Truth-in-Leasing regulations, Federal Motor Carrier Safety Regulations ("FMCSRs"), and applicable state common-law duties, while falling far below basic standards of commercial reasonableness and human decency.

9. As a direct and proximate result of Defendants' conduct, Plaintiff suffered economic losses including unpaid loads, withheld settlements, fabricated negative balances, out-of-pocket expenses, loss of tools and property, and loss of earning capacity, as well as emotional distress and physical discomfort.

10. Plaintiff brings this action to recover damages, obtain equitable and declaratory relief, and hold Defendants accountable for their coordinated and unlawful conduct.

3

## JURISDICTION AND VENUE

11. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1337 and 49 U.S.C. § 14704. This Court has supplemental jurisdiction over Plaintiff's related state-law claims under 28 U.S.C. § 1367.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District and in Ohio, including the Akron, Ohio bridge collision, Defendants' failure to authorize safety repairs affecting operations in Ohio, and the repossession of the tractor and seizure of Plaintiff's personal property in Ohio. Venue is also proper under 28 U.S.C. § 1391(b)(3) to the extent no single district contains all events giving rise to Plaintiff's claims.

13. For purposes of venue, Defendants are deemed to reside in any district where they are subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c).

14. Personal jurisdiction is proper because Defendants' conduct was purposefully directed to Ohio and caused harm in Ohio, including directing Plaintiff to operate equipment affecting Ohio operations, events culminating in the Akron, Ohio collision, and repossession/seizure of Plaintiff's property in Ohio, and because Plaintiff's claims arise out of or relate to Defendants' Ohio-directed conduct and resulting harms in Ohio.

## PARTIES

15.  Plaintiff Tommy Rice is a resident of Akron, Ohio and a licensed commercial driver.

16. Defendant Super Ego Holding, LLC is a limited liability company that, upon information and belief, functioned as the controlling enterprise entity for the Super Ego trucking operation.

17.  Defendant Super Ego Logistics, Inc. is a corporation that, upon information and belief, handled dispatch, settlements, and load management for the Super Ego enterprise.

18. Defendant Super Ego Dispatch, Inc. is a corporation that, upon information and belief, coordinated driver assignments and dispatch operations.

19. Defendant Rocket Expediting, LLC is a corporate entity operating as an integrated sister carrier within the Super Ego enterprise.

20. Defendant Floyd, Inc. is a corporate entity affiliated with the Super Ego enterprise.

21. Defendant Kordun Express, Inc. is a corporate entity affiliated with the Super Ego enterprise.

22. Defendant Jordan Holdings, Inc. is a corporate entity affiliated with the Super Ego enterprise.

23. Defendant Rex Trucking, Inc. is a corporate entity affiliated with the Super Ego enterprise.

24. Upon information and belief, Defendant MN89, LLC is a limited liability company that, upon information and belief, operated as a successor and/or alter-ego continuation of the Super Ego enterprise and/or is a corporate entity affiliated with Super Ego enterprise.

25. Defendant Aleksandar Mimic is, upon information and belief, an owner, controller, and policymaker of Super Ego Holding, LLC and related entities. The precise scope of Mimic's control and involvement is uniquely within Defendants' possession and will be established through discovery.

26. At all relevant times, Defendant Mimic purposefully directed or approved conduct affecting operations in Ohio.

27. Defendant Marco Negic is, upon information and belief, the owner, managing member, or principal of MN89, LLC. The precise scope of Negic's control and involvement is uniquely within Defendants' possession and will be established through discovery.

28. At all relevant times, Defendant Negic purposefully directed or approved conduct affecting operations in Ohio.

29. Defendants John Does 1–50 are individuals or entities whose identities are presently unknown but who participated in, authorized, or carried out the acts alleged herein.

# FACTUAL ALLEGATIONS

## I. Unsafe Equipment Assignments (April–June 2025)

30. Many details regarding Defendants' internal corporate relationships, accounting systems, and claims-handling processes are uniquely within Defendants' possession and will be confirmed through discovery.

31. On or about April 27, 2025, Plaintiff arrived at Chicago O'Hare International Airport pursuant to Defendants' recruitment instructions. Plaintiff immediately contacted Defendants using the telephone number provided by Super Ego recruiters and was transported to Defendants' facilities in Illinois.

32. Over the course of approximately two days, Plaintiff and other recruited drivers were transported between Defendants' headquarters and a nearby hotel, where they were required to complete onboarding paperwork, attend recruiter presentations, view training videos, and submit to drug testing.

33. During this onboarding period, a Super Ego recruiter offered Plaintiff a $1,000 bonus if Plaintiff would travel to Lansing, Michigan to "recover" a truck. The recruiter did not explain the nature or condition of the vehicle, but represented that acceptance of this assignment was Plaintiff's opportunity to obtain a newer model tractor rather than older equipment available on-site. After, recovering the vehicle, Rice never received the bonus in full.

34. On April 29, 2025, relying on these representations, Plaintiff agreed and traveled by train from Chicago, Illinois to Lansing, Michigan, where he discovered the 2023 Peterbilt tractor #5432 to be in poor and unsafe condition. Plaintiff immediately documented the condition of the vehicle and reported it to Defendants with photographs and text messages.

35. Rather than addressing the unsafe condition, Defendants instructed Plaintiff to proceed with dispatch and pick up load #1 from Sparta Michigan to Pompano Beach Florida, and advised him to stop at a Love's Travel Stop for repairs. This marked the beginning of a perilous pattern of chronic mechanical failures and repeated repair visits that persisted throughout Plaintiff's tenure.

## II. Chronic Mechanical Failures and Conscious Disregard for Safety

36. From the beginning, there were four main system problems that never resolved during Plaintiff's entire time with Super Ego: windshield wipers, brakes (tractor and trailer), heating and cooling system, and sticking accelerator pedal.

37. From approximately April 29, 2025 through June 18, 2025, Plaintiff was required to present the assigned tractor "5432" for inspection, diagnostics, or repair on no fewer than twenty-eight (28) separate occasions.

38. While en route to Pompano Beach Florida on the very first load the tractor at times would not accelerate more than 15 mph on 70 mph highways. At other times, it would not stop revving engine speed,even while Rice pressed the brakes.

39. Independent service providers—including Love's Travel Stops, Speedco, and TA Truck Service—documented repeated and unresolved safety defects involving the vehicle's air-conditioning system, windshield and visibility components, braking and air systems, electronic control modules, accelerator function, coolant levels, and other safety-critical systems.

40. Diagnostic reports identified undocumented electronic faults and conditions described as moderately severe, including issues affecting the instrument cluster, chassis controller, ABS/ESP systems, and accelerator response.

41. Brake system defects required repeated chamber replacements, slack adjuster replacements, and per-axle brake adjustments.

42. On the dashboard show transmission fault codes, skid ABS fault codes, braking fault codes, and engine fault codes.

43. Despite this documented history, Defendants denied or delayed authorization for necessary repairs, returned the vehicle to service without permanent correction, and instructed Plaintiff to continue operating the truck.

44. Defendants' conduct exposed Plaintiff to extreme heat without functioning air conditioning, impaired visibility during rain, and compromised braking and control systems.

45. These conditions created a foreseeable and unreasonable risk of harm, including the low-bridge collision that later occurred, as well as significant physical discomfort, emotional distress, and financial loss.

46. In essence, Plaintiff was assigned a tractor " 5432" with serious defects, including: malfunctioning windshield wipers,
engine derate restricting speed to 15 mph,
non-functioning air conditioning in 100°F South Florida heat, electrical failures, unsafe driving conditions.

47. .Between May 8-11, 2025 Plaintiff was forced to pay for hotel rooms out of pocket due to unbearable interior heat in South Florida.

48. Dispatchers provided Plaintiff with incorrect load information, resulting in Rice having to remain in South Florida heat with no AC for three extra days incurring financial losses.

49. Plaintiff possesses an email from Love's Travel Stop showing Super Ego refused to authorize windshield wiper engine repairs, directly leading to a collision.

## III. FMCSA Safety Violations

### A. Hours-of-Service and ELD Manipulation

50. During Plaintiff's tenure with Defendants, Defendants' safety and ELD departments knowingly and intentionally encouraged and facilitated violations of federal hours-of-service regulations.

51. On multiple occasions, Defendants' personnel instructed Plaintiff that he could continue operating beyond the federally permitted driving limits and represented that Defendants would "reset" or otherwise modify Plaintiff's electronic logging device ("ELD") records to permit continued driving.

52. Defendants improperly altered, reset, or instructed Plaintiff to disregard accurate ELD data, allowing or encouraging Plaintiff to exceed the maximum 11-hour driving limit in violation of 49 C.F.R. §§ 395.3 and 395.8.

53. Defendants' conduct was not inadvertent or the result of technical error.

54. Rather, Defendants used ELD manipulation as a routine operational practice to maximize load completion while shifting regulatory risk onto Plaintiff.

55. Plaintiff possesses recorded communications evidencing Defendants' ELD department intentionally encouraging unlawful driving and ELD manipulation.

56. These recordings demonstrate Defendants' knowledge of the violations and conscious disregard for safety.

57. Defendants' ELD misconduct further contributed to Plaintiff's physical exhaustion, emotional distress, unsafe operating conditions, and increased risk of collision, including the Akron, Ohio bridge incident.

58. These actions constitute unlawful coercion, falsification of safety records, and deliberate circumvention of federal motor carrier safety regulations, including but not limited to 49 C.F.R. §§ 395.3, 395.8, 395.34, and 390.6.

59. Defendants' conduct was not accidental or isolated, but was undertaken as part of Defendants' operational practices to maximize freight movement at the expense of driver safety and public safety, and to conceal violations through improper manipulation of federally mandated logging systems.

## B. Low-Bridge Collision (June 18, 2025, Akron, Ohio)

60. On June 18, 2025, during intermittent torrential rainfall, Plaintiff was operating the tractor with unrepaired visibility defects, including malfunctioning windshield wiper engine, and with ongoing mechanical issues including a sticking brake and accelerator pedal. Plaintiff struck a low-clearance bridge in Akron, Ohio, causing damage to the tractor. Plaintiff promptly notified Defendants and requested guidance and repairs. Defendants refused assistance and blamed Plaintiff despite their prior refusal on May 27, 2025 to authorize necessary repairs.

## IV. Withholding of Earned Settlements

61. Following the bridge collision on or about June 18, 2025, Super Ego failed to issue payment for work performed by Plaintiff prior to and contemporaneous with the incident. Plaintiff did not receive settlement compensation due that day, nor did he receive an additional settlement payment previously earned and owed. Defendants did not provide

a written accounting, reconciliation, or lawful justification for withholding these payments.

## V. Fraudulent Inducement to Chicago (June 18–25, 2025)

62. After the bridge incident , Rice felt he owed the company the duty to not abandon his post and bring the truck back to Chicago.  In addition, between June 18-25, 2025, Super Ego promised Plaintiff a newer replacement truck and continued work if he returned to Chicago with the 2023 Peterbilt.

63. Defendants knew these promises were false.

64.  Between June 18-25, 2025, there was constant rain in Akron Ohio.  Between those days, Rice bought with his own money:  guerrilla glue, guerilla tape, duct tape, bungee cords, cleaning supplies, rain gear, tarps, and worked on keeping the interior of the truck dry for five days.  On June 25, 2025, Plaintiff relied on Super Ego's word and drove the roof-damaged 2023 Peterbilt across states in rain with no wipers. Plaintiff barely ate, slept, or drank and was under considerable stress trying to keep the tarp strapped down in the rain.

## VI. Threats & Abandonment at Chicago Yard (June 25, 2025)

65.  Upon Plaintiff's arrival at Defendants' Chicago yard on June 25, 2025, Defendants refused to honor their promises of assistance or replacement equipment. Instead, Plaintiff was confronted by Defendants' personnel, threatened with physical removal, ordered off the property, and denied access to his personal belongings, prompting Plaintiff to contact the Chicago Police Department on two occasions.

66.  Defendants terminated Plaintiff without providing transportation or assistance to return to Ohio.

67. In connection with Plaintiff's forced removal from Defendants' Chicago yard on June 25, 2025, Defendants refused to arrange transportation capable of accommodating Plaintiff's personal and professional property.

68. Defendants ordered only a standard passenger rideshare vehicle, despite knowing Plaintiff possessed trucking tools, equipment, and personal items necessary for his livelihood.

69. As a result, Plaintiff was forced to leave behind substantial tools and equipment inside the tractor, which Defendants later seized and refused to return.

70. After Rice was ushered from the Chicago yard he was taken directly to a hotel room that Super Ego Holdings provided.

71. That hotel room was due for check out the next day at 11:00 a.m.  After Rice arrived at the hotel, Super Ego Holdings completely stopped answering Rice's calls or corresponding about Rice's transportation back to Ohio.

72. By 5:00 p.m. on June 25, 2025,  Rice was officially stranded in Illinois with no money or way to get back to Ohio.

## VII. Illegal Lease – Plaintiff Not Listed

73. Plaintiff learned his name was not on the Super Ego Holdings lease papers, violating 49 C.F.R. §376.11.

74. Defendants used the invalid lease to impose deductions.

75. During Plaintiff's entire time with Super Ego Holding he delivered approximately ____ loads and grossed _____ dollars.   Rice's last three  loads delivers were completely kept and never accounted for by Super Ego Holdings.

76. In the weeks following Rice's departure with Super Ego Holdings,  Rice continued to call and speak with personnel, specifically Rice spoke with a dispatcher/safety representative who identified himself as "Mark," who orchestrated Rice to bring the truck to Chicago the entire time.

77. Mark ridiculed, laughed, heckled at Rice for being foolish enough to bring the truck back to Chicago and getting stranded.

## VIII. MN89's Second Phase of Exploitation (June 25–July 2025)

78. Upon information and belief, MN89, LLC's actions were undertaken pursuant to policies, practices, and authority established or approved by its ownership and management, including Defendant Marco Negic.

11

79. On June 25, 2025, the night Plaintiff was stranded in Chicago without money, transportation or income, an entity later identified as MN89, LLC contacted Plaintiff and represented itself as a new and unrelated carrier offering immediate work and a new 2025 Volvo 670 tractor.

80. On the morning of June 26, 2025, MN 89 personnel came and picked Rice up from the hotel room he was left the night before by Super Ego Holdings. Had MN 89 not called Rice, he would have been broke and homeless, stranded in Chicago, walking the streets eight contractor bags full of metal and trucker gear.

81. Rice was taken to MN89 headquarters in Oak lawn, Illinois. There the procedure was identical to that of Super Ego Holding. At the office, most of the staff—just like Super Ego Holdings—were people of eastern European descent, with very heavy accents who couldn't pronounce English very well. The on boarding process was conducted— signing on boarding paperwork, attending recruiter presentations, viewing training videos, and taking drug tests. Identical to Super Ego Holdings, the process was completed the next day. Rice was then assigned tractor "V8903,* a 2025 Volvo 670. Minutes later, a dispatcher called Rice and he was given instructions to pick up a nearby load.

82. Plaintiff later learned MN89 was operating as a continuation or alter-ego of Super Ego under common control.

## IX. Evidence of Alter-Ego Enterprise

83. Upon the return to Ohio after one of his first loads with MN 89, Plaintiff observed and photographed a Super Ego trailer left in Ohio. Days later, that same trailer was being hauled by an MN89 tractor, proving shared assets and unified control.

84. Defendants also exhibit operational overlap, including identical or near-identical settlement formats and administrative/telephonic system similarities.

85. Upon information and belief, Defendants further share or coordinate additional operational functions, the full extent of which will be confirmed through discovery

## X. Rice and MN 89's working relationship

86. Between June 28, 2025 to August 16, 2025, MN89 then under-dispatched and left him with no loads every weekend, thereby creating a fraudulent −$10,000 debt, culminating in shut off his fuel card in South Carolina.

87.. On or about July 30, 2025, while operating under dispatch for Defendant MN89, Plaintiff was involved in a serious workplace incident at a receiver facility while performing assigned duties within the course and scope of his dispatched work.

88. At the receiver, an aging intermodal trailer owned or controlled by a third party was positioned and/or staged in close proximity to Plaintiff's assigned dock area and within Plaintiff's maneuvering path. The intermodal trailer exhibited visible structural distortion and protrusion that encroached into the clearance area adjacent to Plaintiff's trailer.

89. As Plaintiff was lawfully maneuvering in connection with the delivery and attempting to pull out from the dock, the protruding portion of the intermodal trailer snagged Plaintiff's swing-door trailer, forcibly tearing the trailer door from its hinges and leaving it partially detached and suspended only by a small remaining section of metal near the upper hinge.

90. As Plaintiff exited the cab to assess the damage and to prevent a roadway and workplace hazard, the partially detached trailer door suddenly gave way and fell onto Plaintiff's foot, causing immediate pain, swelling, and injury.

91. Plaintiff promptly reported the incident through Defendants' channels. Defendants and/or their agents generated at least one insurance claim number through Gallagher Bassett relating to the incident and Plaintiff's injury, thereby acknowledging the occurrence and representing that the matter would be handled through Defendants' claims process.

92. Despite issuing claim numbers and acknowledging the incident, Defendants and their claims agents thereafter failed and refused to meaningfully investigate, communicate, authorize medical evaluation, process benefits, or issue a written coverage decision, and instead proceeded in the following days to cut off Plaintiff's fuel access, accuse Plaintiff of fabricated "safety" issues, and terminate operations, compounding Plaintiff's physical, economic, and emotional harm

93. Defendants' failure to process the injury claim and their subsequent fuel shut-off and termination occurred in close temporal proximity to Plaintiff's injury report, supporting an inference that Defendants used claims delay and operational cutoffs to avoid responsibility for the incident and its consequences.

## XI. MN 89's Misidentification and Fabricated Safety Allegations

94. During orientation with MN 89, each driver is instructed to set up five potential DBA's, so that MN 89 can set each drive up as if they were "independent contractors." Rice's DBA ended up being "Carrie-Sue LLC."

95.. At that time, there was apparanetly another driver on MN 89's roster, unknown to Rice, who had a DBA name of "Carrie-Blondie LLC." That driver's name was "Ray Young."

96. On or about August 5, 2025, During a telephone conversation, following the fuel card shut-off in South Carolina, MN89 personnel asserted for the first time that Plaintiff was a "safety hazard." During that conversation, it became apparent that MN89 had confused or commingled Plaintiff's safety records with those of the driver Ray Young—DBA "Carrie Blondie LLC" —a driver operating under a similar but distinct business name.

97. During that phone conversation following the fuel card shut-off, MN89 personnel referenced alleged safety issues that did not belong to Plaintiff and were inconsistent with Plaintiff's driving history and prior communications. The personnel also repeatedly referred to Plaintiff as "Roy," despite Plaintiff's correct name being Tommy Rice. Shortly thereafter, MN89 sent a written termination and cease-operations notice addressed not to Plaintiff or Plaintiff's DBA, but to "Carrie-Blondie LLC c/o Ray Young," a separate and unrelated business entity.

98. Plaintiff's DBA was "Carrie-Sue LLC," not "Carrie-Blondie LLC." Plaintiff had no affiliation with Ray Young. The safety allegations asserted in the notice did not pertain to Plaintiff and were never previously raised during Plaintiff's engagement.

99. This document confirms that MN89 improperly blended or confused safety files between separate contractors and falsely attributed safety violations to Plaintiff that belonged to another driver. MN89 relied on this false attribution to shut off Plaintiff's fuel card, terminate operations, strand Plaintiff out of state, and seize equipment containing Plaintiff's personal property.

100. MN89's actions resulted in Plaintiff being stranded without fuel, deprived of work, and ultimately terminated based on inaccurate or misattributed information. In the following days Rice used his own money to pay for fuel and return to Ohio.

## XII. Unpaid Loads and Withheld Compensation

101.  At the time of the fuel cut off the South Carolina,  Rice's his most recent settlement statement  claimed the rest was $10,000 in debt.  This was the same pattern exhibited by Super Eagle Holdings in Rice's  final days, they manufactured debt administered negative settlement statements, refused to pay Rice or settle on the final loads, and then terminated the contract.

102. For example, Rices last settlement with Suoer Ego Holdings was a negative balances reflected on Defendants' final settlement statement.  However Plaintiff completed at least four additional loads during the week preceding the June 18, 2025 collision, as documented by Defendants' own dispatch sheets. These dispatches reflect gross carrier pay of $1,831.00, $1,690.00, $1,000.00, and $850.00, totaling $5,371.00. None of these loads appear on any settlement statement issued to Plaintiff. Defendants retained the full freight revenue for these deliveries while issuing no payment or accounting to Plaintiff, further increasing Plaintiff's net losses by at least $5,371.00.

103. These amounts reflect gross carrier pay listed on Defendants' dispatch records and are separate from, and not included within, the negative balances shown on Defendants' prior settlement statements.

104. Separately and in addition, during Plaintiff's operation under Defendant MN89's authority,  Plaintiff completed multiple additional freight deliveries for which no settlement, payment, or accounting was ever issued. These unpaid MN89 loads include, but are not limited to: (a) a load completed on or about July 28, 2025, delivered to Lexington, South Carolina, for which Plaintiff received no compensation; (b) a load completed on or about July 29, 2025, delivered to Streetsboro, Ohio, likewise unpaid; and (c) a load completed on or about August 4, 2025, delivered to Perrysburg, Ohio, also unpaid. Each of these loads was successfully delivered, documented by signed bills of lading, and performed during Plaintiff's contractual relationship with MN89, yet none appear on any MN89 settlement statement. Defendants retained the freight revenue generated by these deliveries while withholding payment from Plaintiff, further compounding Plaintiff's losses and demonstrating a pattern of concealed compensation and failure to account. These MN 89 loads correspond to the dispatch sheet/bills of lading described above.

105. Defendants failed to pay Plaintiff for multiple completed loads during the final weeks of Plaintiff's engagement with both Super Ego and MN89, including loads completed immediately prior to termination, despite Plaintiff's full performance. Defendants retained the full freight revenue from those loads while issuing no settlement or payment to Plaintiff.

15

## XIII. Theft of the tractor another driver arrested,

106.  Once back in Ohio, Rice parked the tractor # V8903 and trailer #____ on private property,  repeatedly called MM 89 to get understanding about why he was terminated, why Carrie- Blondie LLC termination letter was sent to him, why his settlements were negative, and why he has not been paid for all the loads he delivered?  Rice never received any answers. Most conversations ended with him being put on hold for hours at a time.

107. On August 16, 2025, in early morning hours, MN89 repossessed the tractor #V8803  from private property without notice and with Rice's belongings inside.

108. On August 16, 2025  Rice filed a police report for theft of tractor #V8903 and property inside.

109. Just like Super Ego Holdings, apparently MN 89 sent an uninformed driver to Akron, Ohio to "recover" this truck in the middle of the night.  Days after Rice reported the tractor stolen, he received a call from Nebraska Highway patrol.  Apparently another driver who "recovered" the tractor, had been pulled over and arrested for grand theft in Nebraska.

110. On September 15, 2025, Rice reported property loss to Olga Diaz of Galleger Bassett and gave her the two claim numbers he had received earlier. July 30, 2025– 040238001412  and  August 16, 2025–040238001413.

111. Insurance agent Olga Diaz and Gallagher Bassett issued two claim numbers, then refused to process the claim.


## XIV. Evidence of Alter-Ego Enterprise

112. Plaintiff photographed a Super Ego trailer left in Ohio, the same trailer being hauled by an MN89 tractor, proving shared assets and unified control.

113.  Defendants also exhibit operational overlap, including identical or near-identical settlement formats and administrative/telephonic system similarities.

114. Upon information and belief,  Defendants further share or coordinate additional operational functions, the full extent of which will be confirmed through discovery.

## XV. Systematic Underpayment, Load-Rate Suppression, and Manufactured Debt

115. Throughout Plaintiff's tenure with Defendants, Plaintiff never realized positive net earnings. Despite continuous work, Plaintiff's settlement statements consistently reflected negative balances due to a combination of undisclosed load rates, excessive deductions, chargebacks, and expenses imposed by Defendants.

116. Defendants routinely failed to provide full and accurate rate confirmations for loads assigned to Plaintiff, preventing Plaintiff from independently verifying gross revenue.

17. When settlement statements were issued, deductions frequently exceeded disclosed revenues, resulting in perpetual negative balances.

118. Plaintiff was under-dispatched for extended periods while still incurring fixed costs, fuel expenses, and lease-related charges controlled by Defendants. These dispatch practices ensured that Plaintiff's compensation could not offset deductions.

119. Defendants asserted a purported debt exceeding $10,000 against Plaintiff without providing itemized justification, contractual authority, or reconciliation, and without demonstrating how Plaintiff could have reasonably earned a positive balance under Defendants' dispatch and deduction practices.

120. Plaintiff reasonably relied on Defendants' representations that the trucking arrangement was economically viable. In reality, Defendants' practices operated to shift operational risk entirely onto Plaintiff while allowing Defendants to retain revenue and control, rendering the arrangement inherently loss-generating for Plaintiff.

121. Upon information of belief defendant designed and implemented settlement in deduction practices that made positive Ernie's mathematically impossible.

# CAUSES OF ACTION

## COUNT I – Truth in Leasing Act Violations
(49 U.S.C. §14704; 49 C.F.R. §376.11–376.12)

122.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

123.  Defendants' violations resulted in Plaintiff never realizing positive net compensation despite continuous operation.

124. Violations Established: (1)No valid written lease naming Plaintiff; (2)Denial of supporting documents; (3)Unauthorized deductions; (4)Fraudulent debt creation; (5) Misrepresented entities; (6) Failed disclosure of rate confirmations; and (7) Shutting off fuel card in violation of 376.12(h).

125. Damages: (1)Lost pay, (2)out-of-pocket costs, (3( statutory damages, and (4) restitution.

126. Defendants further violated federal leasing regulations by withholding settlement payments earned by Plaintiff without disclosure or accounting.

127. Defendants' Truth-in-Leasing violations further include their failure to disclose, account for, or reconcile freight revenue and deductions associated with periods in which Plaintiff was injured while operating under dispatch.

128. Following Plaintiff's July 30, 2025 workplace injury, Defendants withheld settlements and continued asserting fabricated negative balances without providing transparent accounting, thereby concealing the economic impact of unpaid loads and injury-related work interruption in violation of 49 C.F.R. §§ 376.11 and 376.12.

## COUNT II – Breach of Contract / Illegal Contract

129. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

130. The contract was illegal under federal law; Defendants breached:
duty to maintain equipment,
duty of good faith,
duty to provide truthful information,
promises of continued work and replacement truck.

131. Defendants further breached their contractual and statutory duties by failing to provide reasonable support, compensation, or claims processing following Plaintiff's

18

July 30, 2025 workplace injury, despite Plaintiff being injured while performing dispatched work.

132. Defendants' refusal to address the injury, process related claims, or pay earned compensation constitutes a material breach and further demonstrates the illegality and unconscionability of the contractual arrangement.

133. Damages include lost income, hotel costs, repairs, etc.

**COUNT III – Fraud & Fraudulent Inducement**

134. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

135. Defendants' misrepresentations concealed that the compensation structure was designed to produce perpetual losses for Plaintiff.

136. False statements: (1)replacement truck promise; (3) MN89 "new company" claim; (4)fabricated safety violation; (5) under-dispatch deception.

137. Plaintiff relied and suffered financial, emotional, and physical harm.

138. Defendants further misrepresented the basis for Plaintiff's termination by relying on safety allegations belonging to another driver.

139. Defendants' fraudulent scheme extended to their handling of Plaintiff's July 30, 2025 injury. Defendants generated insurance claim numbers through Gallagher Bassett, thereby representing that the injury would be handled and evaluated, while secretly intending not to investigate, adjust, or pay the claim. Plaintiff relied on Defendants' representations and suffered additional harm when Defendants instead retaliated by cutting off fuel access, fabricating safety allegations, and terminating operations.

**COUNT IV – Negligence**

140. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

141. Defendants negligently failed to repair safety-critical equipment.

142. Defendants breached their duty of reasonable care by dispatching Plaintiff into unsafe dock conditions and failing to protect him from foreseeable hazards at receiver facilities. The improperly positioned and visibly bulging intermodal trailer created an unreasonable risk of harm.

143. Defendants further breached their duty by failing to respond appropriately after Plaintiff's trailer door was violently torn from its hinges and fell onto Plaintiff's foot, causing injury during the course and scope of dispatched work.

## COUNT V – Negligent Entrustment

144. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

145. Providing defective equipment knowingly.

146. Defendants' negligent entrustment extended beyond defective tractor conditions to unsafe operational environments. By continuing to dispatch Plaintiff to facilities without regard for known or foreseeable hazards and by failing to intervene or support Plaintiff after the July 30, 2025 injury, Defendants knowingly subjected Plaintiff to unreasonable danger while retaining full control over dispatch decisions.

## COUNT VI – Gross Negligence / Recklessness

147. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

148. Extreme conduct—stranding, forcing unsafe driving, nighttime repossession on private property

149. Defendants' conduct rose to the level of gross negligence and recklessness where, after Plaintiff suffered a workplace injury caused by unsafe conditions at a receiver, Defendants failed to initiate medical assistance, investigate the incident, or process the resulting injury claim. Instead, Defendants abandoned Plaintiff, cut off fuel access, and initiated termination and repossession actions, demonstrating conscious disregard for Plaintiff's physical safety and well-being.

## COUNT VII – Intentional Infliction of Emotional Distress

150. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

151. Outrageous conduct: abandonment, threats, endangering Plaintiff.

## COUNT VIII – Negligent Infliction of Emotional Distress

152. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

153. Severe distress foreseeable from Defendants' conduct.

154. Defendants' extreme and outrageous conduct includes their response to Plaintiff's July 30, 2025 injury. After Plaintiff was physically injured when a trailer door fell onto his foot, Defendants issued insurance claim numbers but then refused all communication, medical support, or resolution. This deliberate indifference, followed by financial cutoff and termination, was intended to coerce, intimidate, and emotionally break Plaintiff and exceeded all bounds of decency.

## COUNT IX – Conversion (Personal Property)

155. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

156. MN89 repossessed truck with Plaintiff's belongings and refused return. Police report constitutes demand.

157. Defendants' refusal to provide reasonable means for Plaintiff to remove his tools and equipment constituted wrongful dominion and control over Plaintiff's personal property.

158. Defendants' conversion of Plaintiff's personal property was exacerbated by their refusal to process Plaintiff's injury claim. After Plaintiff was injured and later stranded following fuel card shutdown, Defendants repossessed the tractor containing Plaintiff's tools and equipment, depriving him of property necessary for recovery and future employment while wrongfully asserting fabricated safety grounds.

## COUNT X – Unjust Enrichment

159. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

160. Defendants retained the benefit of Plaintiff's labor and broker revenues while Plaintiff accrued losses.

161. Retention of Plaintiff's labor, fuel, lodging, and property.

162. Defendants were unjustly enriched by retaining freight revenue and operational control while externalizing all risk and injury costs onto Plaintiff. Despite Plaintiff sustaining a workplace injury during dispatched work, Defendants retained the benefit of Plaintiff's labor without bearing any corresponding responsibility for medical costs, compensation, or claim resolution.

## COUNT XI – Equitable Accounting

163. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

164. Defendants exercised exclusive control over financial records, settlement statements, rate confirmations, deductions, fuel charges, maintenance chargebacks, debt calculations, and lease-related accounting associated with Plaintiff's labor and equipment operation.

165. Defendants failed and refused to provide Plaintiff with complete, accurate, and transparent accounting records, despite repeated requests and despite federal Truth-in-Leasing requirements mandating disclosure.

166. Defendants issued settlement statements that were incomplete, misleading, internally inconsistent, and in some instances identical across multiple entities except for the company name, obscuring the true source, destination, and justification of deductions and charges.

167. Defendants manufactured and asserted a purported debt exceeding $10,000 against Plaintiff without providing itemized support, contractual justification, or reconciliation.

168. The financial transactions at issue involve multiple affiliated entities operating as a single integrated enterprise, rendering ordinary legal remedies inadequate absent a court-ordered accounting.

169. Plaintiff lacks an adequate remedy at law to determine the full scope of amounts earned, withheld, diverted, or misapplied by Defendants without an equitable accounting.

170. WHEREFORE, Plaintiff seeks an order compelling Defendants to provide a full and complete accounting of all revenues, deductions, charges, settlements, fuel transactions, maintenance chargebacks, and debt calculations relating to Plaintiff.

171. Plaintiff cannot determine the disposition of withheld settlement payments or the valuation of seized tools and equipment absent a court-ordered accounting.

172. Upon information of belief, an equitable accounting is further warranted because Defendants issued multiple One insurance and injury claim numbers related to Plaintiff's July 30, 2025 workplace injury but failed to disclose any reserves, payments, denials, or claim handling records. These matters are exclusively within Defendants' control and cannot be determined without court-ordered disclosure.

## COUNT XII – Declaratory Relief

173. Plaintiff realleges and incorporates by reference all preceding paragraphs.

174. An actual and justiciable controversy exists between the parties regarding the legality and enforceability of Defendants' leasing, settlement, deduction, debt-creation, and successor-carrier practices.

175. Plaintiff contends, and Defendants deny, that:
the lease under which Plaintiff was operated was invalid and unenforceable due to non-compliance with 49 C.F.R. §376;

176. Plaintiff was not lawfully bound to fabricated debts asserted by Defendants; MN89, LLC operated as a successor or alter-ego continuation of the Super Ego enterprise;

177. Defendants lacked lawful authority to seize Plaintiff's personal property.

178.. A judicial declaration will resolve uncertainty regarding the parties' legal rights and obligations and will prevent ongoing or future harm to Plaintiff.

179. WHEREFORE, Plaintiff seeks a declaration that:

the purported lease and deductions were unlawful and unenforceable;
the asserted debt is void;

180. MN89, LLC is a successor or alter-ego of the Super Ego entities;
Defendants' seizure and retention of Plaintiff's personal property was unlawful.

181. A judicial declaration is necessary to determine Defendants' obligations arising from Plaintiff's workplace injury, including whether Defendants were required to process, investigate, or provide coverage for injury claims generated through their insurers and administrators, and whether Defendants may lawfully retaliate against a driver for reporting or sustaining an injury during dispatched work.

## COUNT XIII – Civil Conspiracy

182. Plaintiff realleges and incorporates by reference all preceding paragraphs.

183. Defendants knowingly entered into a combination, agreement, or understanding to engage in unlawful acts and lawful acts by unlawful means, including but not limited to:
misrepresenting carrier identity;
shifting drivers between affiliated entities to evade liability;
fabricating debts and safety violations;
denying repairs while compelling unsafe operation;
seizing equipment and personal property without lawful process.

184. Defendants committed overt acts in furtherance of the conspiracy, including issuing false promises, coordinating dispatch and settlement practices across entities, shutting off fuel access, repossessing vehicles, and obstructing insurance claims.

185. Plaintiff suffered financial loss, emotional distress, property loss, and physical endangerment as a direct and proximate result of Defendants' concerted actions.

186. Each Defendant acted as an agent of the others and is jointly and severally liable for all acts committed in furtherance of the conspiracy.

187. WHEREFORE, Plaintiff seeks all damages available at law and in equity resulting from Defendants' conspiratorial conduct.

188. Important information and belief, Defendants conspired to suppress and conceal Plaintiff's July 30, 2025 injury by issuing insurance claim numbers while collectively

refusing to investigate or process the claims, followed by coordinated actions to cut off fuel access, fabricate safety violations, terminate operations, and seize property. These acts were taken in concert to avoid liability and silence Plaintiff.

## COUNT XIV – Unreasonable Refusal/Delay in Claims Handling and Interference with Property Claim (State Law)

189. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

190. In the alternative, to the extent Defendants contend no insurance duty existed, Defendants' conduct constitutes negligent/intentional interference with Plaintiff's claim process and supports damages under Plaintiff's other counts.

191. After MN89 repossessed the tractor containing Plaintiff's personal property, Plaintiff sought to make a claim for his missing/damaged property through MN89's insurance/claims process.

192. Defendants, through their agent Olga Diaz and/or Gallagher Bassett, issued claim numbers to Plaintiff but then failed and refused to meaningfully process, investigate, or adjust the claim, and refused to communicate a legitimate basis for denial. Defendants' refusal and delay were unreasonable under the circumstances and caused Plaintiff continued property loss, out-of-pocket expense, and additional damages.

193. Plaintiff seeks all damages allowed by law and any further relief the Court deems proper.

194. Defendants' reliance on inaccurate safety information further obstructed Plaintiff's ability to challenge the seizure of his property or pursue related claims.

195. Defendants' bad-faith conduct includes their handling of Plaintiff's July 30, 2025 workplace injury claim. Defendants, through Gallagher Bassett, issued one or more claim numbers acknowledging the injury, then failed to investigate, communicate, approve, or deny the claim. This pattern of issuing claim numbers without action demonstrates systemic bad faith and intentional interference with Plaintiff's right to compensation and medical evaluation.

**COUNT XV – Negligence (FMCSR Violations as Evidence of Negligence; Negligence Per Se in the Alternative)**

196. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

197. Because Ohio treats administrative-rule violations as evidence of negligence rather than negligence per se, Plaintiff pleads negligence per se only to the extent any cited duties are statutory in nature; otherwise, the violations are pled as evidence of negligence.

198. At all relevant times, Defendants were "motor carriers" and/or agents of motor carriers within the meaning of the Federal Motor Carrier Safety Regulations ("FMCSRs"), 49 C.F.R. Parts 350–399, and owed Plaintiff a non-delegable duty to comply with those regulations.

199. The FMCSRs were enacted to protect commercial motor vehicle operators, other motorists, and the public from unreasonable risk of injury, fatigue-related crashes, mechanical failures, and unsafe driving conditions.

200. Plaintiff is within the class of persons the FMCSRs were designed to protect, and the harms suffered by Plaintiff—including physical injury, emotional distress, economic loss, and property damage—are the types of harms the regulations were intended to prevent.

**A. Equipment Safety and Maintenance Violations**

201. Defendants violated 49 C.F.R. §§ 392.7, 392.8, 396.3, and 396.7 by knowingly requiring Plaintiff to operate a commercial motor vehicle that was not in safe operating condition.

202. Defendants required Plaintiff to operate equipment with known and unresolved safety defects, including but not limited to: malfunctioning windshield wipers and visibility systems;
defective braking systems affecting both tractor and trailer;
non-functioning air-conditioning during extreme heat conditions;
electrical and electronic control faults;
a sticking accelerator pedal.

203. Despite repeated repair attempts documented by Defendants' own approved service vendors, Defendants denied or delayed authorization for necessary repairs and returned the vehicle to service without correcting safety-critical defects.

204. Defendants' conduct constituted evidence of negligence because it violated mandatory federal safety regulations and directly created foreseeable risks of collision, physical injury, and financial harm.

## B. Hours-of-Service and ELD Manipulation Violation

205.. Defendants violated 49 C.F.R. §§ 395.3, 395.8, and 395.34 by coercing, encouraging, and directing Plaintiff to operate beyond federally permitted hours-of-service limits.

206. Defendants, through dispatch, ELD personnel, and supervisory staff, knowingly encouraged Plaintiff to drive in excess of the 11-hour driving limit and 14-hour on-duty window.

207. Defendants further violated federal law by intentionally manipulating, resetting, or directing the alteration of Plaintiff's electronic logging device ("ELD") records to conceal hours-of-service violations.

208. Plaintiff possesses recordings and communications evidencing that Defendants' ELD departments intentionally instructed Plaintiff to exceed lawful driving limits and assured Plaintiff that the violations would be "fixed" or erased within the ELD system.

209. Upon information and belief, these actions were not accidental, technical, or isolated errors, but deliberate practices designed to increase load completion and revenue while shifting safety risks onto Plaintiff.

210. Defendants' conduct violated 49 C.F.R. § 390.6, which prohibits motor carriers from coercing drivers to violate safety regulations, including hours-of-service requirements.

## C. Causation and Harm

211. As a direct and proximate result of Defendants' FMCSA violations, Plaintiff was subjected to:

extreme fatigue;

unsafe operating conditions;

increased collision risk;

physical injury;

emotional distress and anxiety;
loss of income and earning capacity;

unpaid wages and withheld settlements;

seizure and loss of personal property.

212. Defendants' hours-of-service violations and ELD manipulation materially increased the risk of fatigue-related incidents and compounded the dangers created by defective equipment, directly contributing to the bridge collision and Plaintiff's downstream losses.

## D. Negligence Per Se and Enhanced Liability

213. Because Defendants violated federal safety statutes enacted to protect Plaintiff, such violations constitute evidence of negligence as a matter of law.

214. Defendants' knowing and intentional disregard of FMCSA safety regulations further constitutes reckless and wanton misconduct, supporting an award of punitive damages.

215. Each Defendant is jointly and severally liable for the harms caused by these violations, as the conduct was undertaken pursuant to enterprise-wide policies, practices, and control.

216. WHEREFORE, Plaintiff seeks all damages available at law and in equity arising from Defendants' negligence per se, including compensatory damages, punitive damages, statutory relief, costs, interest, and any further relief the Court deems just and proper.

## XVI – Alter-Ego / Successor Liability

217. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

218. Upon information and belief, and based on Plaintiff's observations and documents, Defendants operate as a single integrated enterprise and alter-egos/successors of one another, including shared or coordinated asset utilization (including tractors and trailers), settlement/accounting practices, and administrative systems. The full extent of common ownership, control, and operational integration is uniquely within Defendants' possession and will be confirmed through discovery.

219. Upon information and belief , the mishandling of Plaintiff's injury claim occurred across entities operating as a single enterprise, including MN89, Super Ego, and their shared claims administrators. The issuance of claim numbers followed by uniform silence and retaliation confirms centralized control and alter-ego liability.

**COUNT XVII – Direct Liability of Aleksandar Mimic and Marco Negic**

220. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

221.  Upon information and belief, Defendants Aleksandar Mimic and Marco Negic, individually, exercised ownership, managerial authority, and control over the enterprise entities and directly participated in, authorized, ratified, or knowingly failed to prevent the unlawful conduct alleged herein.

222. Defendants Aleksandar Mimic and Marco Negic are personally liable for authorizing, ratifying, or knowingly permitting policies that resulted in the suppression of Plaintiff's workplace injury claim, retaliation following the injury, and abandonment of Plaintiff without medical or financial support.

# DAMAGES AND HARM RESULTING FROM DEFENDANTS' CONDUCT

## A. Economic Damages

223. As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered substantial economic damages, including but not limited to:

224. Withheld and Unpaid Compensation.

225. Compensation for multiple completed freight deliveries that were never paid or accounted for, including loads completed immediately prior to and contemporaneous with Defendants' termination actions, despite Plaintiff's full performance.

226. Manufactured and Fraudulent Debt Balances.

227. Artificial negative settlement balances created through undisclosed deductions, suppressed load rates, unauthorized chargebacks, and improper accounting practices, resulting in the assertion of a fictitious debt exceeding $10,000.

228 . Out-of-Pocket Expenses.

229. Expenses personally paid by Plaintiff due to Defendants' misconduct, including fuel purchases following unlawful fuel-card shutoffs, hotel and lodging costs incurred due to unsafe equipment and extreme heat exposure, food, travel, survival expenses while stranded out of state, and costs incurred to preserve and protect Defendants' defective equipment.

230. Loss of Tools, Equipment, and Personal Property.

231. Loss and deprivation of Plaintiff's personal and professional property, including tools and equipment necessary for Plaintiff's livelihood, seized during repossession and wrongfully retained by Defendants.

232. Loss of Earning Capacity and Opportunity.

233. Lost income and diminished earning capacity resulting from Plaintiff being stranded without transportation or fuel, deprived of tools necessary to work, subjected to false safety allegations, and rendered unable to accept alternative employment opportunities during and after Defendants' retaliatory conduct.

## B. Physical Harm and Injury-Related Losses

234. Plaintiff further suffered physical harm and injury-related losses as a result of Defendants' conduct, including:

235. Workplace Injury. C Someone

236.  Physical injury sustained during a dispatched delivery when unsafe dock conditions caused a trailer door to be forcibly torn from its hinges and fall onto Plaintiff's foot.

237.  Exacerbation of Physical Conditions.

238.  Physical discomfort, pain, swelling, and related symptoms aggravated by Defendants' refusal to authorize repairs, exposure to extreme heat without air conditioning, extended fatigue from unlawful hours-of-service practices, and lack of post-injury support.

239. Denial and Delay of Medical and Injury-Related Support.

240. Additional harm caused by Defendants' issuance of insurance claim numbers followed by refusal to investigate, communicate, approve, or deny coverage, leaving Plaintiff without guidance, treatment authorization, or resolution.

## C. Emotional Distress and Mental Anguish

241. Defendants' conduct caused Plaintiff severe and ongoing emotional distress, including but not limited to:

242.  Anxiety, Stress, and Humiliation.

243. Emotional harm arising from abandonment out of state without money or transportation, threats and confrontations at Defendants' facilities, false accusations of being a "safety hazard," and the seizure of Plaintiff's livelihood.

244.  Sleep Disturbance and Psychological Strain.

245. Distress associated with prolonged uncertainty, fear for personal safety, financial insecurity, and Defendants' deliberate indifference following Plaintiff's injury.

246.  Emotional Harm from Retaliation and Deception.

247. Emotional injury resulting from Defendants' issuance of insurance claim numbers and promises of assistance, followed by silence, retaliation, fuel shutoffs, termination, and repossession, which Plaintiff reasonably experienced as betrayal and coercion.

## D. Litigation-Forcing and Administrative Damages

248.  Defendants' misconduct forced Plaintiff to expend significant time, effort, and resources to protect his rights and mitigate harm, including:

249.  Repeated attempts to obtain payment, explanations, and accounting records wrongfully withheld by Defendants;

250.  Efforts to recover seized personal property and tools necessary for employment;

251. Time and expense incurred responding to fabricated safety allegations and correcting misidentification with another driver's records;

252. The necessity of pursuing equitable accounting and judicial relief due to Defendants' exclusive control over critical financial and claims-handling information.

## E. Punitive-Warranting Conduct

253. Defendants' actions were knowing, willful, repeated, and undertaken in conscious disregard of Plaintiff's safety, rights, and well-being, including but not limited to:

Compelling operation of unsafe equipment;
Manipulating safety and logging systems;
Retaliating following a workplace injury;
Issuing insurance claim numbers without intent to process claims;
Coordinating termination, fuel shutoff, and repossession to coerce and silence Plaintiff.

254 Such conduct supports an award of punitive and exemplary damages sufficient to punish Defendants and deter similar misconduct.

## F. Reservation of Proof

255 The full extent and valuation of Plaintiff's damages are presently unknown and remain within Defendants' exclusive possession and control. Plaintiff reserves the right to prove all damages, including additional compensatory, statutory, punitive, and equitable relief, through discovery and at trial.

# PRAYER FOR RELIEF

256. Plaintiff requests:

Compensatory damages

Restitution

Property damages

Emotional distress damages

Punitive damages

Statutory damages under the TILA

Costs, interest

Any other relief the Court deems proper

## JURY DEMAND

226. Plaintiff demands trial by jury.

Signature

Tommy Rice          1/23/2026
Plaintiff, Pro Se
865 Grant Street
Akron, Ohio 44311